# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

FILED
CLERK, U.S. DISTRICT COURT

APR 2 1 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

ROBERT F. COYNE,

                              **Plaintiff,**

             -v-

ASTA FUNDING, INC.,

                            **Defendant.**

CASE NO: CV14-3034-ABC(MRWx)

**COMPLAINT AND PETITION TO VACATE ARBITRATION AWARD**

Plaintiff/Petitioner Robert F. Coyne for his Petition to vacate an arbitration award against him alleges as follows:

## NATURE OF PROCEEDING

1.  This is an action pursuant to 9 U.S.C.A § 10 to vacate the Arbitration Award (the "Award") issued by the Arbitrator in the matter for ASTA Funding Inc v New World Solutions, Inc. The arbitrator issued a "Partial Final Award (Jurisdiction)" on March 5, 2014. (Coyne Dec Exhibit 1)

2.  The award holds that the arbitrator has jurisdiction over petitioner in the arbitration action.

3.  The award must be vacated as a matter of law because an arbitrator can never decide his own jurisdiction over a non-party to an arbitration agreement.

4.  The award is offensive to public policy. The award essentially gives free reign to any individual to declare themselves an arbitrator and then decide their own jurisdiction over any other person. Arbitration, as a matter of contract, can never extend to a non-party to an arbitration agreement.

PAID   APR 2 1 2014   Clerk, US District Court   3   4612

5. The award directly contradicts a long line of Supreme Court case precedent which has established that an arbitrator can never decide his own jurisdiction over a non-party to an arbitration agreement. The arbitration award is a mockery of the Supreme Court.

6. The award violates the very fundamentals of contract principles. Simply put, there was no offer, no acceptance, and no consideration, never any bargained for exchange of promises. An arbitrator is not vested with any statutory powers, nor are they elected or appointed to any office. They are simply selected by parties to an agreement to decide some dispute. It is un-denied that petitioner is not a party to an arbitration agreement, did not agree to arbitrate any matter, did not select an arbitrator and did not participate in any arbitration proceeding.

## JURISDICTION AND VENUE

7. This action arises under section 28 U.S.C § 1332 because the dispute is between citizens of different states. There is complete diversity.

8. This Court is empowered to decide jurisdictional issues regarding arbitration disputes for non-signatories to a contract pursuant to 9 U.S.C § 10. Because defendant has substantial business ties to the State of California, venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(d).

9. Venue is further proper because this arbitration action was brought by defendant against plaintiff solely for the purpose of harassment. Plaintiff is not a party to any arbitration agreement with defendant and defendant had no legal basis to file the arbitration demand against plaintiff.

10. Plaintiff's has no claims pending against ASTA Funding aside from those arising from the improper joinder to the arbitration where he was a non-party. The petitioner in this matter is a Plaintiff in name only - that is, the relief sought arises over the improper joiner and award against a non-party who has no agreement to arbitrate with the Defendant.

11. Defendant ASTA Funding, Inc. has substantial business ties to the State of California. For example, defendant ASTA Funding recently announced a "joint venture" with Balance Point Funding, of which it is a member of the LLC.

12. Balance Point is headquartered in Los Angeles, CA. According to defendant's website and SEC filings, defendant has an intent to invest "up to $15,000,000" in that entity. According to court documents, defendant ASTA is a member of that LLC, which lists its headquarters in Beverly Hills, CA.

13. Over the last ten years, defendant ASTA Funding invoked the powers of the California Courts tens of thousands of times, by bringing civil actions against debtors in California State courts.

14. ASTA Funding is a shell company with no employees however it reports significant revenues earned through its wholly owned subsidiary companies and partnerships in California on its publicly filed reporting as required by the Securities Exchange Commission.

15. By way of example and without limitation, in the last 10 years, Palisades Collections, LLC, a wholly owned subsidiary of defendant ASTA Funding:

Filed not less than 713 consumer credit lawsuits in San Mateo County, CA.

Filed hundreds of lawsuits in San Francisco County, CA.

Filed tens of thousands of debt collection lawsuits in the State of California

16. According to regulatory filings by defendant ASTA Funding, it is a purchaser of debt on a nationwide basis including the debt of California residents.

17. Upon information and belief, defendant ASTA Funding, through its wholly owned subsidiary Palisades Collections, LLC, made millions of debt collections phone calls over a period of more than 10 years to California debtors while attempting to collect those debts.

18. The business ties which ASTA Funding has to the state of California are long standing, substantial and diverse in geography and fully disclosed on their public filings.

19. The Supreme Court has found that an action to vacate an arbitration award under 9 U.S.C § 10 may be brought in any District Court which has proper jurisdiction. Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co., 529 U.S. 193, 120 S.Ct. 1331, U.S.Ala.,2000. *Held: The FAA's venue provisions are permissive, allowing a motion to confirm, vacate, or modify to be brought either in*

*the district where the award was made or in any district proper under the general venue statute.*

## **PARTIES**

20. Petitioner Robert Coyne is an individual and resident of the State of California.

21. Respondent ASTA Funding, Inc is a Delaware C Corporation with a headquarters in New Jersey.

22. In July of 2012, respondent ASTA Funding filed an arbitration demand against petitioner's former company, New World Solutions, Inc. ('NWS')

23. Plaintiff was at all times a passive member in NWS, he never met any representative of knowing visited any location of the Defendant.  He never provided or received any services from Defendant.  His total communications with defendant over a 10 year period were less than 9 and only arose by the request by NWS.

24. In December of 2012, petitioner transferred his full interest in New World Solutions to its sole shareholder, David Neal.

25. In September of 2013, respondent filed a second arbitration demand against petitioner and Neal.  In the case of the petitioner this was 10 months after he terminated his relationship NWS.

26. Plaintiff received notice of the second arbitration demand by email when out of the country with limited email access.  Plaintiff responded to the arbitrator by email as a courtesy only while overseas.  He preserved his rights by rejecting jurisdiction and noted he was traveling with limited email access.  Despite this information the arbitrator acted irrationally and joined him as a party.  <u>In short, a non-party Plaintiff with no agreement to arbitrate was joined to an arbitration while out of the country by email service when had limited to no ability to respond.</u>

27. Petitioner did not participate in the arbitration proceeding and repeatedly stated that he was not bound by any arbitration agreement with respondent.

28. If Petitioner responded to the arbitration, he could have been deemed to have consented to the arbitration.  Therefore to preserve his rights with this court he had no choice but not to

participate in the arbitration notwithstanding that no agreement to arbitrate existed between petitioner and respondent and the proceedings were improper.

29.  Respondents arbitration demand filed in September of 2013 with the AAA stated that an agreement to arbitrate existed between petitioner and respondent.

30.  At the time that respondent filed the arbitration demand against petitioner, respondent knew that no agreement to arbitrate existed between petitioner and respondent.

## THE AWARD MUST BE VACATED BECAUSE THE ARBITRATOR HAS NO JURISDICTION OVER PLAINTIFF

31.  Arbitration is strictly a creature of contract and arbitrators draw their authority solely from the agreement of the parties to submit their dispute to arbitration.  See:  United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960). "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.", AT&T Techs. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)., "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.", PaineWebber, Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir.1990).,  "[A]s a matter of contract, no party can be forced to arbitrate unless that party has entered an agreement to do so."

32.  In the instant matter, it is undisputed that plaintiff is not a party to the ASTA/NWS contract and did not enter into any agreement to arbitrate any claims with ASTA.

33.  Plaintiff has continuously and vigorously opposed any jurisdictional determination of the arbitrator over him.

34.  A non-signatory to a contract can never be found to be bound to that contract by an arbitrator.

35.  The arbitrator is simply devoid of any authority to do so unless the non-signatory so agrees. This exact issue was before the Supreme Court in First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, U.S.Pa.,1995. "Third, they disagree about who should have the primary power to decide the second matter. Does that power belong primarily to the arbitrators (because the court

*reviews their arbitrability decision deferentially) or to the court (because the court makes up its mind about arbitrability independently)? We consider here only this third question."*

36.   In considering that question, e.g. who should decide arbitrability, the court reviewed the record before it and found no agreement between the party attempting to compel arbitration and the individual parties resisting it, who were not signatories to a contract to arbitrate.  *"On the record before us, First Options cannot show that the Kaplans clearly agreed to have the arbitrators decide ( i.e., to arbitrate) the question of arbitrability."*

37.   In concluding that the Court should decide arbitrability, the Supreme Court found that the lack of the individual's agreement to arbitrate was dispositive for the purpose of deciding who should decide, (e.g. the court or the arbitrator) the issue of arbitrability. *"We conclude that, because the Kaplans did not clearly agree to submit the question of arbitrability to arbitration, the Court of Appeals was correct in finding that the arbitrability of the Kaplan/First Options dispute was subject to independent review by the courts."*

38.   In this case, as in *Kaplan*, there is no agreement by plaintiff to arbitrate any of his claims with defendant.

39.   In this case, as in *Kaplan*, defendant relies on a contract between it and the plaintiff's company.

40.   In this case, as in *Kaplan*, the individual plaintiff has resisted and objected to arbitration.

41.   In summary, the Supreme Court has already decided the outcome of the exact same set of facts presented in this case when it decided in *Kaplan*: that it was for the Court, and not the arbitrator, to decide arbitrability.

42.   The arbitrator exceeded his authority when he issued an order finding jurisdiction over plaintiff personally.

43.   He again exceeded his authority when he issued a partial final award finding his jurisdiction over plaintiff.  The very first sentence of the arbitration award is false: <u>the arbitrator was never designated by plaintiff to decide any issue about anything.</u>

## <u>COUNT 1 – VACATUR OF ARBITRATION AWARD / JURISDICTION</u>

44. Plaintiff repeats and re-alleges paragraphs 1 to 41 as if set forth fully herein.

45. Plaintiff moves to vacate the award of the arbitrator Bartkus issued on March 5, 2014.

46. Arbitration awards may be vacated when the arbitrator exceeds his authority. *See 9 USC 10(a)(4)*.

47. Arbitration awards may be vacated when the award runs counter to public policy. *See Sprewell v. Golden State Warrios, 266 F.3d 979, 986 (9th Cir 2001); Am. Postal Workers Union AFL-CI?O v. US Postal Serv., 682 F.2d 1280, 1284 (9th Cir. 1982)*.

48. Arbitration awards may be vacated when the arbitrator manifestly disregards the law. *See Comedy Club, Inv v Improv W. Assoc., 553 F. 3d 1277 (9th Cir. 2009), Am. Postal Workers, 682 F.2d at 1284*.

49. The arbitrator exceeded his authority when he issued an arbitration award finding his own jurisdiction over a non-party to an arbitration agreement.

50. The arbitrator disregarded the law when he issued an arbitration award finding his own jurisdiction over a non-party to an arbitration agreement.

51. The arbitration award is offensive to public policy because it makes a mockery of the Federal Arbitration Act, the Due Process protections of the Constitution, Supreme Court case precedent, and 200+ years of contract law.


For the foregoing reasons, the award of arbitrator Bartkus finding his own jurisdiction over non-party Petitioner should be vacated in its entirety.


DATED: April 21, 2014

Robert Coyne, Plaintiff

# EXHIBIT 1

**AMERICAN ARBITRATION ASSOCIATION**
**COMMERCIAL ARBITRATION TRIBUNAL**

ASTA FUNDING, INC.

        CLAIMANT,

- AGAINST –

NEW WORLD SOLUTIONS, INC.,  DAVID
SHAUN NEAL AND ROBERT F. COYNE,
ESQ.,

        RESPONDENTS.

Case #18 117 Y 00925 12

Assigned Administrator:
Yvonne L. Baglini

PARTIAL FINAL AWARD
(JURISDICTION)

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the Information Technology Services Agreement dated on or about June 30, 2009, having been duly sworn, and having heard the evidence and arguments of the Claimant at hearings held in New Jersey on January 7, 10, 16, 20, 21 and 24, 2014, and Respondent Neal having appeared on January 7 only, and Respondent Coyne having not appeared after due notice in accordance with the Rules, do hereby enter the following Partial Final Award as to Jurisdiction:

On about October 16, 2013 I issued a preliminary finding that Respondent David Shaun Neal (hereafter "Neal") was subject to the arbitration clause signed by New World Solutions, Inc. ("NWS") giving rise to this arbitration (Prehearing Order #17, or the "Consolidation Order"). Additionally, in setting a hearing schedule I indicated that I would entertain additional factual and legal presentations to me regarding the issue of jurisdiction over the individual Respondents. Claimant and Mr. Neal have provided materials to me in that regard, including Claimant's Post-Hearing brief (and references and copies of its jurisdictional submissions to the U.S. District Court, D.N.J., in Neal v. Asta, and Mr. Neal's pre-hearing "Position Statement of Respondents." Mr. Coyne has objected to jurisdiction in this proceeding, as to him, but I am not

aware of any submission by him indicating factual or legal arguments in support of his position. I am not aware of any post-hearing submission by Mr. Neal, individually or as the representative of NWS at this arbitration, regarding the specific factual or legal issues surrounding the jurisdiction issue. (He has submitted generalized objections and "positions", but without factual or legal case citations.) I also have received evidence regarding the issue, both testimony and documents, including Arbitrator Exhibit #4, submitted by Claimant in February, 2014.

As an initial matter, I must resolve whether I have jurisdiction to determine whether there is an agreement permitting me to hear and decide claims that may be made against the Respondents. The relevant documentation of the parties' agreement to arbitrate is Claimant's Hearing Exhibit (hereafter "CEx") number 1, an Information Technology Services Agreement dated on or about June 30, 2009 (hereafter the "Agreement" or 2009 "Services Agreement") signed by Mr. Coyne on behalf of "New World Solutions, Inc. ('NWS'), a Delaware corporation" and Cameron Williams on behalf of Asta Funding, Inc.

Section 14.2 of that Agreement includes a choice of law and forum provision that does not refer to arbitration. However Section 6.2 of the Agreement ("Escalation") does provide for arbitration:

> "In the event that a dispute, controversy, or claim between the Parties arising directly or indirectly out of or in connection with this Agreement cannot be resolved by the IT Services Managers, either Party may elect to have such dispute, controversy, or claim resolved by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ('AAA')."

"Party" or "Parties" are defined in the introductory paragraph, page 1, as NWS and ASTA. The Services Agreement provides, further, in Section 3.1 ("Basic Services") that "during the Term, NWS, acting through its personnel, will provide to Asta …" certain services on an exclusive basis. Section 14.8 ("Parties Obligated and Benefited") provides:

2

"This Agreement will be binding upon the Parties hereto and their respective permitted assigns and successors in interest and will inure solely to the benefit of such Parties and their respective permitted assigns and successors in interest, and no other Person."

"Person" is defined in Section 1.14. Section 6.1 requires each party to "appoint a single 'IT Services Manager.'" Neal was an IT Services Manager. Asta also points to what it terms the "Confidentiality Covenants" in Sections 8 and 9 of the Services Agreement as relevant to the term "Party". Mr. Neal signed the Confidentiality Order in this case on behalf of NWS, though his obligations to honor that Order, as a principal of NWS and its "representative" in the arbitration, are different from the question as to whether he is subject to arbitration "claims" made by Asta by reason of the 2009 Services Agreement.

Of note regarding the threshold issue of my jurisdiction to decide is the parties' choice in the 2009 Services Agreement of the "Commercial Rules" of the AAA as governing their dispute. Section R-7(a) of the Commercial Rules in effect at the time of the Agreement (and at the commencement of this arbitration), provided:

"The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."

Any objections to the arbitrator's jurisdiction must be raised, according to Section R-7(c) "no later than the filing of the answering statement ...."

Ever since *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995), at least, the parties may decide to have jurisdictional issues resolved by the arbitrator, at least in cases governed by the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*[1] Since the AAA Commercial Rules provide that the arbitrator may determine his or her own jurisdiction, the parties' designation of

---

[1] As the parties are described in CEx-1, this dispute began as between a Delaware company with offices in New Jersey and a Delaware company with offices in California and elsewhere; moreover, the nature of the companies' business crosses state lines. The parties agree, therefore, that the case is a dispute involving interstate commerce governed by the FAA.

3

the AAA Commercial Rules is seen as an election by the parties to confer on the arbitrator the power identified in R-7 to decide jurisdictional issues, *i.e.*, with "respect to the existence, scope or validity of the arbitration agreement."

The parties therefore have given to me the authority to decide the question of my "jurisdiction" as defined in R-7. Asta has submitted to me a number of cases that confirm this determination, including *Bapu Corp. v. Choice Hotels Int'l, Inc.*, 2008 U.S. Dist. LEXIS 71252 (D.N.J. Sept. 8, 2008), *aff'd*, 371 Fed. App. 306 (3d Cir. 2010). As the Circuit stated in that case:

> "We thus agree with the District Court that the question of arbitrability was one for the arbitrator to decide and that appellants' arguments regarding the arbitrator's jurisdiction over the case do not present grounds for vacatur of the arbitrator's decision."

371 Fed. App. at 309. I also note that Judge Dreier's New Jersey Arbitration Handbook, section 2-1, at 13 (2013), agrees that the AAA Commercial Rules provide the authority for the arbitrator to determine his or her own jurisdiction over the individual Respondents, *i.e.*, whether the individual Respondents are parties to the arbitration agreement.

I fully understand Mr. Neal's position that the AAA Commercial Rules cannot have given the arbitrator the authority to decide the question of jurisdiction over the individual Respondents, based on the parties' selection of the AAA Commercial Rules in the Services Agreement, where the predicate issue is whether Mr. Neal can be bound to that agreement despite not being a signatory. He views the argument as circular and not unlike the question of which comes first, the chicken or the egg?  I also recognize that the question whether an individual is bound by an arbitration agreement that has been signed by a corporation is different in kind from the question of the scope of the agreement, for example, where it is undisputed that parties A and B have signed the agreement. Similar circularity has plagued the logic of arbitrability determinations since at least *Prima Paint*, where it was determined that the arbitrator

must determine whether a contract was valid, yet the determination as to whether there is a valid arbitration clause within that contract was deemed severable and for a court to determine.

It is not just a matter that someone must decide; it had been the law under the FAA for a very long time before *First Options*, for example, that a court is to decide whether there exists an agreement to arbitrate, and the New Jersey revised arbitration statute also indicates that the decision is to be made by a court (absent other designation). Rather, as I consider the parties' election of the AAA Commercial Rules, it appears that the decision of arbitrability is a function of determining the meaning of the term "party" or "parties" and applying standard "contract law" or "agency law" interpretations of who may be bound by a contract or receive its benefits. This determination is clearly within the authority granted in R-7(a): to decide issues with "respect to the existence, scope or validity of the arbitration agreement." Whether an agreement "exists" as to the individual Respondents therefore comes within the authority granted by R-7(a).

Respondents have cited to me no authority that is contrary to the cases cited by ASTA and the reading I have given R-7(a)'s terms and application. They objected to my receiving their D.N.J. brief. While I cannot hold Respondents' effective silence on the issue against them, *per se*, their silence does not assist me in determining the issue in their favor.

Having decided that I have the jurisdiction to determine whether the term "Parties" in paragraph 6.2 of the Services Agreement includes the individual Respondents, including whether there "exists" an agreement between ASTA and the individual Respondents, and the scope of that agreement, or whether they should be bound to arbitrate based on other principles that the courts have discussed, I must consider the facts and cases relevant to such issue or issues. After considering choice of law questions, below, I turn first to NWS, even though it is not contesting my jurisdiction as to it.

Choice of Law

Because there appears to be the possibility of conflicts between and among various jurisdictions regarding whether and the extent to which persons may be bound to an arbitration agreement, despite not having physically signed it (so called "non-signatories"), I must first consider what law applies, including the law of what state and the extent to which federal law applies.

The parties' Agreement provides that New Jersey law shall apply to this dispute. Because federal and state courts deciding cases governed by the FAA hold that contract interpretation and related issues are to be determined by state law, I therefore must apply New Jersey law or make an effort to determine what a New Jersey court would decide, much as a federal court must do with respect to state law, regarding any contract interpretation or related state-law issues, such as agency.

To the extent that there are federal law questions, such as the application or interpretation of the FAA, however, I must apply federal law. I have not been provided any guidance as to what Circuit I should look to if there are any conflicts among the Circuits, that is, where the question has not been decided by the Supreme Court.

Questions regarding the obligations of a "non-signatory" to an arbitration agreement have been addressed by both New Jersey state courts and federal courts (applying different states' laws). The most recent New Jersey Supreme Court case of which I am aware in this specific area is *Hirsch v. Amper Financial Services, LLC*, 215 N.J. 174 (2013), and to the extent that it has decided questions of New Jersey state law, including contract and agency law in this regard, I am bound by that decision. Nevertheless, other cases both federal and state may give guidance where *Hirsch* does not mandate the result or lead me to predict a result.

6

Normally I would be bound by the Third Circuit in questions of federal law, since I am in New Jersey and this contract is governed by New Jersey law (and the Third Circuit encompasses New Jersey). Separately, much as is the case of a New Jersey state court looking at questions of New Jersey state law, which are not bound by the Circuit in that situation, neither am I. (I do not sit as a federal district judge, which might be bound by the Circuit on questions of state law.) Thus, Circuit decisions that merely interpret or predict state law do not bind me the way decisions of the New Jersey Supreme Court would. I may consider other Circuits decisions insofar as they consider common law principles that have not been rejected in *Hirsch*.

That said, I note that *Hirsch* – which also looks to a U.S. Supreme Court decision for guidance, and which is consistent with other Circuit decisions in many respects – provides considerable guidance on these issues. In general, it mandates that I do not strain to find jurisdiction, even in light of courts' oft-cited preference for arbitration as a dispute resolution mechanism. As *Hirsch* held, "even when parties have not expressly agreed to arbitrate their disputes, ... *careful scrutiny* is necessary to determine whether arbitration is nonetheless appropriate." 215 N.J. at 196 (emphasis added). In performing that "careful scrutiny," I must consider "the contractual terms, the surrounding circumstances, and the purpose of the contract." *Id*. at 188. In that regard, *Hirsch* is consistent with a long line of New Jersey cases regarding contract interpretation.

Jurisdiction as to NWS

Although the question of my jurisdiction over NWS would seem to be a non-issue, since "NWS" signed the Services Agreement and NWS has not to my knowledge questioned my jurisdiction as to it (at least not since its August 22, 2012 Answering Statement, before it filed a

Counterclaim acknowledging jurisdiction), the question is actually less straight-forward than might be assumed. Nevertheless, I find that I do have jurisdiction with respect to "NWS".

The "NWS" identified in the 2009 Services Agreement is a Delaware corporation, which the evidence has shown was formed in about March 2007 (Tr. at 749) by Messrs. Neal and Coyne as equal owners; they were also its only officers and directors. (Neal Dep. Tr. at 25; Tr. at 720.[2]) Presumably, the Delaware corporation was the NWS that Claimant intended to name as the Respondent in this arbitration when it was commenced by electronic means on July 26, 2012, using a New York City street address for Respondent's location. The Statement of Claim does not identify the citizenship or incorporation status of NWS, but notes only that the NWS named as a Respondent had entered into the Services Agreement, that Mr. Neal was the IT Services Manager assigned by NWS to Asta, and that he and Mr. Coyne were co-owners of NWS. These allegations were not challenged by NWS in its August 22, 2012 "Answering Statement" filed by counsel.

"NWS" filed a Counterclaim signed by Mr. Neal for NWS. That Counterclaim was dated, by hand, "11/8/12" and does not indicate that the counterclaimant is anything different from the NWS that signed the Services Agreement or the NWS that is the Respondent; in fact, the Counterclaim refers to NWS as both Respondent and counterclaimant, and the Counterclaim seeks relief under the Services Agreement as though "NWS" were a party to the Services Agreement. In about December 2012, a month after the Counterclaim was filed, according to his deposition testimony (Tr. at 729 & 754), Mr. Coyne transferred his 50 percent ownership interest

---

[2] Unless otherwise indicated, "Tr." indicates the page of the several volumes of the transcript of the hearings in this matter. The Coyne reference is somewhat unique, since portions of his deposition were read into the hearing record; I therefore refer to his deposition by the Hearing transcript page numbers. I was provided with Mr. Neal's deposition, which was not read into the record, and my references to his deposition will be "Neal Dep. Tr. at ___" indicating the page number of that deposition transcript.

in "NWS" to Mr. Neal, who thus became the sole beneficiary of any award that might be rendered on the "NWS" Counterclaim. (Tr. at 755). Mr. Neal also assumed all the liabilities "for" NWS. (*Id.*)

During the arbitration, however, it became evident that NWS, a Delaware corporation, had been dissolved, possibly without notice to Asta, in July 2010 (*i.e.*, after the Services Agreement was signed but before its termination and before this arbitration was commenced). (Tr. at 719.) In May of that year (Tr. at 749) a new NWS was formed in Wyoming by Messrs. Coyne and Neal (Tr. at 719-20) using the services of a "shelf" company under circumstances that Asta contends were suspicious. There was no documentary evidence presented to me (by Claimant or Respondents) that the Services Agreement was assigned from NWS-Delaware to NWS-Wyoming (*but see* Tr. at 752, stating that assets and liabilities were assumed/transferred), or that Asta was aware of the change in corporate status when it commenced this arbitration. Mr. Neal testified that nothing was signed. (Neal Dep. Tr. at 70.) He did say that there were oral communications with Asta, including with "Seth [Berman]" regarding the transfer (*see* Neal Dep. Tr. at 70-71), but Mr. Berman was not asked about this issue. (Although I had not precluded Respondents from presenting witnesses or evidence at the hearing, they elected not to do so; nor did Mr. Neal testify.) Likewise, there was no evidence presented to me that NWS-Delaware was merged into NWS-Wyoming. Although a merger certificate normally would be filed with the state to indicate such a transformation, the certificate presented to me (as an attachment to Coyne Dep. Ex. 9) did not contain any reference to such. As already indicated, Mr. Neal – who had assumed the duties of NWS's representative in this arbitration (thereby replacing other counsel, including Mr. Coyne) – did not indicate in the November 2012 NWS Counterclaim that there had been any change in corporate status, citizenship or

9

ownership/management. The deposition testimony indicated, however, that he was fully aware of the dissolution and reincorporation; and he indicated that he was or had been an owner of both the Delaware and Wyoming entities. (*E.g.*, Neal Dep. Tr. at 68.)

Mr. Coyne was an attorney (and may still be) and would have been expected, from his background and common understanding, to document such corporate changes with Asta.

I also have been presented with a dissolution certificate for the Wyoming company, which I marked as Arbitrator Exhibit #4, indicating that the Wyoming corporation also had been dissolved and its agent resigned, in July 2013, during discovery in these proceedings when issues of alleged improprieties had begun to be discussed in earnest. I do not recall being made aware of the dissolution at the time. NWS-Wyoming had been dissolved earlier, in July 2012 at about the time of the termination of the Asta contract, but it apparently was reinstated for a year by paying the required tax or fee.

To be clear: at the time the arbitration had been commenced and at the time that Mr. Neal filed the Counterclaim, NWS – Delaware had been dissolved, but Mr. Neal and Mr. Coyne (who was a 50 % owner until December 2012) continued to put "NWS" forward as being the "party" to the Services Agreement and to this arbitration. Under established principles, including involving fraud, estoppel and corporate successor-ship, I find that both NWS-Delaware and NWS-Wyoming are parties to the Services Agreement for purposes of being parties to the arbitration. As will be evident, this "transformation" of NWS (and the role of Messrs. Neal and Coyne in that process and its externalities) also affects my analysis as to whether the individual Respondents are "parties" to the Services Agreement and are bound by its arbitration clause.

<u>Jurisdiction as to the Individual Respondents</u>

<u>Jurisdiction as to Mr. Neal.</u>

The facts regarding Mr. Neal relevant to the jurisdiction question are as follows (in summary). As already noted, he was a co-owner and officer/director of NWS-Delaware at the time of the 2009 Services Agreement and served through its term as the IT Services Manager of Asta on behalf of NWS. (The Services Agreement designates that role, *see* paragraph 6.1.) He was hired in about July 2004 as Asta's IT director or manager, as a consultant, but used a company called Bach Consulting, owned by Mr. Coyne (Neal Dep. Tr. at 18).[3] He testified that he personally applied for the job in response to an ad (Neal Dep. Tr. at 16), and he was requested by ASTA to set up or use a consulting company to serve as the mechanism for his being hired (*id*. at 17-18). NWS was used as the consulting vehicle starting in about 2007, though apparently without a written contract. (Neal Dep. Tr. at 16-21.) Mr. Neal was an officer and director of NWS, as well as a 50% owner, but he received the bulk of his income from NWS via an IRS form "1099" rather than a W-2, which would indicate that he was "working" as a "consultant" for NWS rather than as an employee. NWS was said to have other clients, but its overwhelming work and income was from Asta.

As indicated earlier, Mr. Coyne, not Mr. Neal, signed the Services Agreement, but I have not been presented with any evidence that Mr. Coyne performed any services for Asta through NWS, other than (possibly) setting up or managing a Philippine entity that was used to outsource programming or other work from NWS for Asta.

In early 2009, at a time when Mr. Neal was working for NWS but before NWS signed the 2009 Services Agreement, he recommended (Neal Dep. Tr. at 43) that Asta replace its then-

---

[3] The two were 50/50 business partners already, using NWS as a d/b/a (Neal Dep. Tr. at 15), such that Bach was a vehicle used to permit Neal to work with Asta. (*See id*. at 15 & 18-19.)

current server-monitoring services company with a company called Sun Interactive Services, Inc. (hereafter "Sun Interactive" or "SISI"). This company was owned by Mr. Coyne, and there was no evidence presented to me that it had any prior experience in providing computer systems "monitoring" services. Mr. Neal signed the SISI Managed Services Agreement on April 24, 2009 on behalf of Asta; it was signed for SISI by "Kevin McGee", whom Mr. Neal says he did not know (and Asta could not locate). The testimony was conflicting as to whether Mr. Neal was authorized to sign for Asta (though his approvals of the SISI invoices, CEx-99, were honored). He denied any recollection of the agreement during portions of his deposition (*e.g.*, Neal Dep. Tr. at 169-71), including whether it was Mr. Coyne's company – though he had previously indicated otherwise. Mr. Coyne refused to answer questions regarding Sun Interactive during his deposition, despite my direction (from Oxford during a telephone conference) that he do so; Mr. Neal's deposition testimony, including his professed failure of memory, regarding the selection of this company was not credible. The prior contractor had received $22,000 per month; SISI received $9,000 to $10,000 for those basic services (*see* CEx-99), which invoices Mr. Neal approved. Asta alleges that the services were not provided or were substantially fraudulent; the "reports" of periodic testing were argued to be, and appeared to me to be, untrustworthy and not indicative of actual monitoring.

Asta presented evidence that Mr. Neal's annual income from NWS's work at Asta was in the six-figures, a compensation that was not consistent with his professed lack of knowledge of a large variety of functions and processes, including the Philippine workforce, server failures, insurance, a dialer problem and the reported dialer fix to be undertaken by Mr. Neal, Sun Interactive and what people did for Asta on behalf of NWS. Asta also presented evidence by the IT consultants it hired after the termination of NWS (including their extensive reports), and by

12

expert testimony, that Mr. Neal breached his and NWS's confidentiality obligations and that NWS's services were woefully deficient. As the NWS IT manager, Mr. Neal was individually responsible for that deficiency.

Asta also presented extensive evidence that Sun Interactive and Mr. Neal were complicit in a fraud regarding the use of Oracle software and the purported purchase of an Oracle license and services. This included outright lies to Asta and Oracle personnel by Mr. Neal regarding the licensing, as evidenced by a number of emails–of which Mr. Neal denied recollection (*e.g.*, Neal Dep. Tr. at 201-16—and expert testimony presented by Asta). His denials were not credible. There was clear and convincing testimonial and documentary evidence presented that there was no such license with Oracle or through a designated dealer for the software and/or services. Asta also presented evidence that funds attributed to Asta's payment purportedly for an Oracle license, orchestrated by Mr. Neal, were traced to Mr. Coyne and Mr. Neal; no money went to Oracle or any dealer.[4]

In summary, the evidence presented to me, and not rebutted by Respondents in any credible manner, was that Mr. Neal and Mr. Coyne used NWS, both before and after execution of the 2009 Services Agreement, to defraud Asta of hundreds of thousands if not millions of dollars. If this were a RICO case, there is no doubt that NWS would have been characterized as the "enterprise" through which these individuals had perpetrated that fraud and conspired to defraud Asta.

---

[4] Mr. Neal points out that the Sun Interactive contract was entered before the Services Agreement and has no arbitration clause. But these facts are not determinative to arbitrability under the Services Agreement. The jurisdiction issue is a function of what Respondents did in their positions at NWS and Asta once the Services Agreement was signed. And their positions, then, enabled them to take the wrongful actions re SISI described in this arbitration.

13

In making my determination as to jurisdiction, I recognize that the jurisdiction issue is separate from a determination as to liability. I understand that these Respondents will not necessarily escape liability for their alleged actions if I find I do not have jurisdiction (*i.e.,* they may be sued separately or they may be pursued in order to enforce any judgment against NWS), so my decision is not based on a predilection to find jurisdiction in order to determine liability. Rather, I must look to contract and agency principles as permitted by the caselaw.

I also recognize that this evidence (which will be detailed more fully in my discussion as to liability and damages) was presented as part of a proof hearing after the Respondents had willingly defaulted. However, the Respondents were provided multiple opportunities to counter Claimant's evidence at the proof hearing. I made it clear several times that Respondents would be allowed to cross examine any witnesses presented to me – an opportunity that Mr. Neal took advantage of, on behalf of NWS and himself, individually, on the first day of the hearing (but at no other time).[5] I also made it clear, both on the transcript and by way of prehearing order, that I would entertain requests by Respondents to present their own evidence. My allowing Respondents to request to provide evidence at the hearing was particularly important, as far as I was concerned, because one purpose of the hearings was to develop evidence with respect to the jurisdictional issues. I made it clear that I wanted to hear Respondents' side.

As recognized in *Hirsch* and a number of other state and federal cases, there are five or six primary theories under which an individual may be required to arbitrate claims against him or

---

[5] We waited for Mr. Neal to appear for each hearing after the first, but he did not. He was told at the first hearing that his "individual" participation in the hearings would not be deemed a waiver of any jurisdictional defenses he was making, and he agreed (Tr. at 27-28). He made arguments at that first hearing, but was instructed to limit his participation at that point (*i.e.*, during his cross of Mr. Berman) to proper cross-examination.

14

her (or have claims against him or her arbitrated) even though he or she did not personally sign a contract with an arbitration cause:

> "The United States Supreme Court has recognized that, in the context of arbitration, "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third party beneficiary theories, waiver and *estoppel*.'" *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631... (2009) (emphasis added) (quoting 21 *Williston on Contracts* § 57:19, at 183 (4th ed. 2001)). In other words, in assessing whether parties can be compelled to arbitrate, courts can use principles of contract law even in the absence of an express arbitration clause. *See ibid.*"

215 N.J. at 188-89. *See also, e.g., Haskins v. First American Title Ins. Co.*, 866 F. Supp. 2d 343, 348 (D.N.J. 2012) ("Under New Jersey law, a non-signatory may be bound to an arbitration agreement under one of several theories: (1) incorporation by reference, (2) assumption, (3) agency, (4) third-party beneficiary, (5) veil-piercing/alter ego, and (6) waiver and estoppel.")

I am not persuaded that cases such as *Pritzker v. Merrill Lynch*, 7 F.3d 1110 (3d Cir. 1993), cited by Claimant, are directly relevant to the issues of jurisdiction here, since that line of cases concerns whether a non-signatory can compel arbitration of a claim brought by a signatory, especially where that non-signatory is joined as a defendant in a litigation against a signatory that has a principal-agent relationship with the non-signatory. I believe that there is a different policy involved in permitting a non-signatory defendant to claim the benefit of an arbitration agreement signed by his or her employer or affiliated company, and the cases agree with me. Nevertheless, these cases remain useful in understanding the policy concerns of the five or six contract-agency theories in applying them to the facts of this arbitration. I look at each in the order presented by Asta.

A. Agency

*Hirsch* recognized that non-signatory jurisdiction may be determined by reference to what it termed agency principles, and specifically approved a leading Appellate Division case,

*Alfano v. BDO Seidman, LLP*, 393 N.J. Super. 560 (App. Div. 2007), that had relied on agency to find jurisdiction. However, as with *Pritzker*, the plaintiff in *Alfano* was resisting the request that a non-signatory could compel arbitration of his disputes – not the situation here.

Claimant relies on three cases to show that Mr. Neal is "bound" by the Asta-NWS arbitration clause in the Services Agreement under agency principles: *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.,* 181 F.3d 435 (3d Cir. 1999); *Merrill Lynch Inv. Managers v. Optibase, Ltd.,* 337 F.3d 125 (2d Cir. 2003); and *Hinnant v. American Ingenuity, LLC*, 554 F. Supp. 2d 576 (E.D. Pa. 2008), yet none helps its position.

*Bel-Ray* involved a signatory moving to compel arbitration as to non-signatories; which application was denied. Although there may be additional factors here that did not exist in *Bel-Ray*, there is no indication that the pure "agency" factors here would have been sufficient if presented there. Rather, *Bel-Ray* restates the common law principle that the agent for a disclosed principal is not bound by the contract he or she signs on behalf of the disclosed principal. This is consistent with the Circuit Court opinion in *Kaplan, supra,* which *Bel-Ray* cites. Saying that Mr. Neal was a "principal" of NWS does not win the argument; the words are used in different contexts and with different meanings. To the extent the "agency" factor is accepted in *Bel-Ray* as relying on facts relevant to the other factors (identified in the cases), I believe it is best to focus on facts relevant to those factors rather than to call it "agency" per-se.

Although *Merrill Lynch* involved a signatory seeking to compel arbitration over a non-signatory company (there an affiliate of a signatory company), the Second Circuit found that there was no basis to grant the requested injunctive relief compelling arbitration. Indeed, the Second Circuit distinguished *Pritzker*, which it called "muddled". 337 F.3d at 131.

16

*Hinnant* is no more help, not only because the parties had agreed that the non-signatory would be bound; the logic of the facts that Asta emphasizes is found in a footnote that shows that the court might have granted a request by the non-signatory (an owner and/or officer) to compel arbitration, under *Pritzker*, if he had not already obtained the consent of the signatory-plaintiff.

In short, I have not been presented with an "agency" case that would lead to arbitrability here, despite the facts that the Claimant emphasizes. *Hirsch* says only that "arbitration may be compelled by a non-signatory against a signatory to a contract on the basis of agency principles." 215 N.J. at 192; *see also id.* at 193 (discussing parent and subsidiary relationships). As noted in *Alfano*, it is one thing for a court to compel arbitration requested by a non-signatory/agent, especially one whose acts are being attributed to the signatory/principal, in order to avoid the plaintiff from organizing the litigation unfairly, and the actions of the non-signatory were integral to the cause of action against the signatory. Mr. Neal's actions are integral to the claims against NWS, but he is resisting arbitration, not seeking to compel it.

B. Veil-Piercing/Alter-Ego Theory

Claimant points to the relationships between and among the two NWS entities and Mr. Neal as an officer and 50 percent owner of NWS for the proposition that the corporate veil should be pierced under standard New Jersey common law fraud principles (and cases) and Mr. Neal should be held liable for corporate obligations including the obligation to arbitrate as an alter ego of NWS. Claimant has sustained its burden to make out a prima-facie case with respect to this issue, and based on the documents and testimony I conclude that it has done more, *i.e.*, it has shown the fraud factors required by clear and convincing evidence.

I conclude for example that Mr. Neal's and Mr. Coyne's deposition testimony was not credible in regard to the changes in NWS's corporate structure. I concur with Asta that the

17

changes were not undertaken for a legitimate purpose, but that the changes continued and cemented their ability to extract funds from Claimant. The several entities were nothing more than a façade for the illicit operations of the two shareholders, including Mr. Neal, and their efforts to extract money from Asta. The tax returns also evidence a pass-through. This relationship began when Mr. Neal used NWS as a d/b/a, in his words, with Asta, before the SISI agreement and continued through the execution of the Services Agreement; his recommendation of an unqualified entity (SISI) to perform computer services for Asta; his approval of invoices for "monitoring" purportedly done by SISI; the Oracle "purchase"; his misuse of individual computer/personal information (such as Social Security Numbers); and through the termination of NWS's services. Indeed, his role continued through the arbitration, when Mr. Neal signed the arbitration Counterclaim on behalf of "NWS". He then accepted the assignment of Mr. Coyne's interests and liabilities in NWS in December 2012. Claimant has represented that in discovery NWS did not produce any of the corporate documentation that would be expected for a functioning entity, including shareholder agreements, corporate minutes or transfer/assignment records. I also received evidence that tax returns were not filed for these entities since 2011.

I am particularly influenced by Mr. Neal's role in NWS's continuing to pursue arbitration in this case, including the Counterclaims of NWS, not just after NWS was no longer a viable entity but also after it was dissolved (all without notifying the AAA or Claimant). This was *not* the normal winding up process for a corporation. The Counterclaim was signed by him in November 2012; he received Mr. Coyne's interests and liabilities the next month; and he did not decide *not* to participate in this case until after the Consolidation Order of October 2013 – months after the NWS-Wyoming entity was dissolved in July 2013. Freed of any corporate

which states that the agreement is binding on all "successors in interest". That would include Mr. Neal, and extend to his being bound to the arbitration clause.

     C. Estoppel

     Although *Hirsch* has limited the applicability of the "intertwinement" theory of equitable estoppel to these questions, *Hirsch* did not eliminate estoppel altogether as a possible basis to find jurisdiction. Intertwinement, alone, is not sufficient "when its application is untethered to any written arbitration clause between the parties, evidence of detrimental reliance, or ... oral agreement ...." 125 N.J. at 192-93 (emphasis added).

     Possibly because Asta relied on the pre-*Hirsch* "intertwinement" theory of arbitrability, Claimant did not specifically address (to me) whether Mr. Neal's conduct met the *Hirsch* requirement of detrimental reliance. That is, did Asta expect to be able to arbitrate its claims against Neal in detrimental reliance on any actions by him? Asta has not alleged that it detrimentally relied, which may conclude the analysis.

     *Hirsch* did not disavow what is known as the "direct benefit" theory of estoppel, though that theory has been accepted in other states, such as New York, and has been referenced obliquely in New Jersey even after *Hirsch, e.g., Westfield Ins. Co. v. Interline Brands, Inc.*, No. 12-6775, 2013 U.S. Dist. LEXIS 178949, at *26 (D.N.J. Dec. 20, 2013) (non-signators "have reaped no benefit" from the agreement); *Eric Baker Architecture, PC v. Mehmel*, No. A-1187-12T4, 2014 N.J. Super. Unpub. LEXIS 2847, at *10 (App. Div. Nov. 26, 2013) (no "direct benefit"). Although some cases accept the doctrine, they note that it did not apply. *E.g., Bouriez v. Carnegie Mellon Univ.*, 359 F.3d 292, 295 (3d Cir. 2004). *Haskins, supra*, described federal cases that analyzed estoppel theories, which the Court categorized as either the "knowingly exploit" theory or the (discredited) "intertwinement" theory. 866 F. Supp. 2d at 350-51.

intermediary, he was personally the sole beneficiary of any award on a multi-million dollar counterclaim. He also was NWS's successor as to obligations and liabilities.

In support of whether these theories may be used to force a non-signatory to arbitrate the related claims, Claimant cites to *dictum* to this effect in several cases that seem to trace their roots, at least in part, to *Fisser v. International Bank*, 282 F.2d 231, 234-35 (2d Cir. 1960) ("We have heretofore held that the obligation to respond in damages arises from a contract to which the alter ego theory binds that parent which as 'puppeteer' has 'directed his marionette' to sign. .. We hold now that if the parent is bound to the contract then like its marionette it is bound to submit to arbitration."). In one case, the lack of evidence of veil-piercing or alter ego was cited as grounds for not using this theory, nor was arbitration compelled on other grounds. But in *Oriental Commercial and Shipping Co., Ltd. v. Rossell, N.V.*, 702 F. Supp. 1005, 1018-23 (S.D.N.J. 1988), District Judge Peter Leisure found the elements of alter ego present and ordered arbitration.

I am satisfied that the veil-piercing – alter ego theory of arbitrability is applicable where a signatory attempts to require a non-signatory to arbitrate a dispute related to the facts surrounding or giving rise to the non-signatory's veil-piercing-alter ego status; this theory is fully supported by the factual record and is applicable here. Mr. Neal therefore must arbitrate the claims against him here.

Moreover, as Claimant argues, once a company has been dissolved – as here – the principals of the corporation may become liable for its liabilities and obligations. *Cf. Studerus Oil Co. v. Bienfang*, 122 N.J.L 238 (Supreme Ct. 1939). I was not presented with any cases that apply this principle to the arbitrability question, but I can see no reason why it would not follow from common law principles of successor liability, and Section 14.8 of the Services Agreement,

In looking at the direct benefit estoppel cases, facts present here may be relevant. First, it is clear from the facts presented to me that Asta and Neal were aware of the arbitration clause in the Services Agreement, at least by the time of the original arbitration (in which Neal was not joined). He was NWS's principal contact with Asta, and he became its representative in the arbitration once its attorneys withdrew from the case. *See Hirsch*, 215 N.J. at 195. He signed/filed its Counterclaim in November 2012, and he soon thereafter became the sole beneficiary of that Counterclaim (rather than a 50 percent beneficiary). He therefore "expected to reap the benefits that accompany arbitration," *id.* at 195, before Asta asserted that he might be bound to arbitrate the claims that were alleged in the Consolidation Order in October 2013.

Despite the "strict scrutiny" I am required to apply to equitable estoppel claims of arbitrability, I cannot say with assurance that the New Jersey Supreme Court would not sustain arbitrability under the direct benefits theory of equitable estoppel. The Supreme Court emphasized in *Hirsch* that estoppel should not be used as a sword to compel arbitration but is "more properly viewed as a shield to prevent injustice ...." 125 N.J. at 180. I view estoppel in that "shield" role. Where, as here, Mr. Neal knowingly exploited the Services Agreement, there is a strong equitable sense that he should not be permitted to disavow its obligations, including arbitration. He should be permitted to force Asta to the additional litigation expense of proving its claims against him, as set out in the amended claim in the Consolidated Arbitration, <u>again</u> in a litigation (having already proved its case against NWS and him on the same facts, based on Mr. Neal's actions). It is not just that they are inter-related; they are identical. The direct benefit cases also indicate that jurisdiction is proper here.

The most recent discussion of the <u>direct benefit</u> theory to my knowledge is by the New York Court of Appeals, its highest Court, in *Belzberg v. Versus Investments Holdings, Inc.*, 21

N.Y.3d 626 (2013), decided two months after *Hirsch*, in which it declined to require arbitration under the facts presented. There, it emphasized that the non-signatory "knowingly exploit" the agreement and receive a direct benefit from the agreement, as distinct from the relationship created by the agreement. As it explained:

> "For example, in *Deloitte*, the Second Circuit found that there is a direct benefit where the contract at issue is the direct source of the benefit. Deloitte Haskins & Sells ("Deloitte") and its affiliates formed, via a memorandum agreement, an international association called Deloitte Haskins & Sells International ("DHSI"). Noraudit was the Norwegian affiliate of DHSI. DHSI decided to merge with Touche Ross International ("Touche"), another accounting firm. DHSI settled several merger-related issues with [*632] its affiliates by signing a settlement agreement giving them limited use of the name "Deloitte." Noraudit apparently approved the settlement agreement without signing it, continued to use the name "Deloitte," and sued DHSI to obtain a declaration that it had the right to use the "Deloitte" name in Norway. DHSI sought to compel arbitration on the basis of the arbitration clause contained in the settlement agreement. Noraudit asserted that its claim was governed by the memorandum agreement giving rise to DHSI, and that it was not a signatory to the settlement agreement. The Second Circuit held that Noraudit "failed to object to the Agreement when it received it and offers no persuasive reason for its inaction" and "knowingly accepted the benefits of the Agreement through its continuing use of the name 'Deloitte.'"

21 N.Y.2d at 631-32. "Whether the agreement affects some independent contractual relationship of the nonsignatory" is indicative of a direct benefit. *Id.* It found that merely receiving profits through another entity was "indirect" and not sufficient to satisfy the test.

As difficult as the distinction in *Belzberg* may appear, it is illustrated by the earlier case of *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile. S.A.*, 863 F.2d 315 (4th Circuit 1988), not discussed in *Belzberg*. In *J.J. Jones*, the non-signatory was party to a contract that was derivative to a contract with an arbitration clause. Its rights flowed directly from the contract with the arbitration clause.

The clearest explanation of a direct benefit theory might be the subcontractor that is contemplated when a general contractor signs an agreement with an arbitration clause, where the

subcontractor assumes and accepts responsibility for a certain portion of the work under the primary contract. In the instance of an explicit assumption of the prime contract, the subcontractor's responsibility to arbitrate might be understood under the "assumption or incorporation by reference" test. I understand that the direct benefit test may still be satisfied where (in this hypothetical) the subcontractor has not _formally_ or explicitly assumed the prime contractor's obligations in writing but does so by other acts or writings.

Here, Mr. Neal was not an employee of NWS or Asta; he became a consultant to NWS – and was paid via a 1099 from NWS. His initial hiring by ASTA was done through an intermediate consulting entity, after he personally applied for the position (Neal Dep. Tr. at 16-18); he was therefore a direct beneficiary of any contractual relationship between Asta and that consulting company (Bach or NWS). This direct benefit continued through 2004 into 2007 and then 2009 when the relationship was documented – with a writing that contained the arbitration clause. His continued relationship with NWS and Asta was derived directly from the 2009 Services Agreement. He was not a mere employee in that regard – the reason for signing the 2009 Services Agreement was to continue _his_ services as IT Manager, a position from which he derived outsized income far in excess of any reasonable value for what he provided.

Mr. Neal further derived a direct benefit from the Services Agreement insofar as it gave him access and authority to retain and supervise other vendors of IT services, including his "supervision" of SISI post June 30, 2009. In that role, he approved invoices for monitoring services that were not substantiated; and he engaged in a fraud regarding the Oracle software and services that were necessary to run Asta's database. He directly benefited from his access to Asta's emails, and client data, which he improperly diverted to his personal accounts.

Mr. Neal also derived a direct benefit from the arbitration agreement by reason of his prosecution of the NWS Counterclaim, which was based on the contractual relationship between NWS and Asta. The Services Agreement is repeatedly referenced and relied upon in the Counterclaim. Although he was only a 50 percent beneficiary of any proceeds from that Counterclaim at the outset, he became the sole beneficiary of the Counterclaim a month before, in December 2012, and he became the "successor" beneficiary once NWS-Wyoming was dissolved in July 2013. Binding Mr. Neal to this arbitration will serve the "integrity of the system," *Associated Financial Web Printing, LLC v. Kupchik*, No. A-1962-12T3, 2013 N.J. Super. Unpub. LEXIS 2351, at *7 (App. Div. Sept. 17, 2013) (distinguishing *Hirsch*).

Asta has cited *International Paper Co. v. Schwabedissen Maschinen & Anlagen GmbH*, 296 F.3d 187 (4th Cir. 2000), in the D.N.J. briefs it sent to me, to show that Mr. Neal has relied on the 2009 Services Agreement in his claims in the D.N.J. action or actions. I do not rely on that theory in finding Mr. Neal subject to jurisdiction in this action. The D.N.J. action or actions are not before me, and I do not think it has been argued to me that Mr. Neal's actions in the D.N.J. action or action(s) implicates jurisdiction here. Such a link may be one step too far removed.

D. Third Party Beneficiary

Asta did not address third-party beneficiary theories to justify arbitrability, though that is a recognized basis for imposing jurisdiction regarding non-signatories. *See Hirsch*, 215 N.J. at 188. Under *Broadway Maintenance Corp. v. Rutgers*, 90 N.J. 253 (1982), a person may be a third-party beneficiary if the contracting parties underlined intended that he or she receive a benefit that would be enforced in the courts. I do not know if Mr. Neal has in any of his personal complaints in federal court sought to obtain or enforce a benefit that he claims derives from the 2009 Services Agreement; if he has, then he would be bound by the third-party benefit theory or an

24

estoppel to deny that he was a party to the agreement. Those facts have not been presented to me, so I do not find arbitrability based on this theory.

E. Assumption or Incorporation by Reference

Claimant has not directly asked me to consider the assumption/incorporation basis for arbitrability, although Asta has referenced factors that would give rise to jurisdiction over Mr. Neal through such normal contract interpretation principles.

First, I consider whether the term "Party" in the arbitration clause is intended only to refer to NWS. In the initial definition, on the first page of the agreement, parties is defined as the two entities; "party" is defined as follows: "NWS and Asta are referred to individually as 'party' ..." That is not definitive. I also look to paragraph 3.3, which allows subcontracting (as with Mr. Neal). Assignment is prohibited without written consent, per paragraph 14.4, except in certain interesting instances. For example, NWS can assign the agreement to an NWS affiliate, and NWS can assign the contract to anyone who obtains all of these assets and liabilities of NWS. However, that same section indicates that no other "Person" may benefit from the agreement. Given Mr. Neal's position and his successor status, I find that such limiting language does not apply to him.

Mr. Neal is not named in the Services Agreement, but his position (IT Manager) is identified several times, and the evidence was clear that he was intended to fill that position (and no one else.)

The Confidentiality clauses, Sections 8 and 9 of the Agreement, provide duties to a Party that can only be undertaken or violated by an individual. Thus, references to "party" in these sections also includes (principally) Mr. Neal, who was responsible for honoring these provisions and who personally and directly violated these provisions in several respects. The same logic

25

might make Mr. Neal personally liable for violations of the Confidentiality Order that he signed in this arbitration, but I need not reach that issue, since he was directly involved in the violations of that Order by reason of his role as "representative" of NWS and as the person who supervised the relevant discovery.

I also note that the arbitration clause in Section 6.2 is a broad one, relating to all disputes between the "Parties arising directly or indirectly out of or in connection with this Agreement …."

In summary, I find that a single conclusion flows inevitably and inescapably from the circumstances and facts surrounding Mr. Neal's involvement with Asta and NWS: he is bound to arbitrate the claims asserted against him in the supplemental/amended claims that became part of this arbitration by reason of the Consolidation Order.

<u>Jurisdiction as to Mr. Coyne.</u>

The facts presented at the hearing regarding Mr. Coyne lead to a different result regarding jurisdiction over him on the claims set out in the supplemental/amended claims joined by the Consolidation Order.  Although he signed the Services Agreement and was a 50 percent owner of the various NWS entities, until December 2012 (factors that do not in themselves lead to finding arbitrability as to a non-signatory), he did not have the same role with Asta as did Mr. Neal. The Services Agreement did not facilitate the direct continuation of his working with Asta to the same extent as it did for Mr. Neal.  There was no evidence that Mr. Coyne became involved in the same failures to provide services as did Mr. Neal (other than as to SISI), and Mr. Coyne is not accused of diverting emails and files with personal identifiers of customers to his email account, as did Mr. Neal. Moreover, Mr. Coyne had transferred his interests to Mr. Neal in December 2012, so that Mr. Coyne no longer had a stake in the arbitration at the time the SISI

fraud was uncovered or when NWS-Wyoming was finally dissolved. He no longer stood to benefit – at least by the evidence presented to me – from any award an arbitrator might have made on the NWS Counterclaim (if NWS had not defaulted). He did not sign the Counterclaim.

It is true that Mr. Coyne benefited from NWS and its ability to orchestrate funds flowing to SISI for "monitoring" and Oracle software and services that were not provided to Asta. His denials of knowledge or memory during his video deposition (which I was shown in part) were not credible; his adamant refusal to answer questions regarding SISI during his deposition gives rise to an inference that he knew the transactions were fraudulent. Although he may not have derived the same payments from Asta as did Mr. Neal, the funds Mr. Coyne received were still significant. And, of course, NWS's corporate status was altered by Mr. Coyne. He viewed himself as an "entrepreneurial" type who, in fact, used NWS as what might have been characterized as the "enterprise" if this were a RICO case; he clearly conspired with Mr. Neal.

Based on all these factors, the jurisdictional evidence is less compelling as to Mr. Coyne than it is as to Mr. Neal, but I still find that the corporate veil should be pierced as to him, thereby subjecting him to the jurisdiction of this arbitration regarding the claims made against him in the Amended/Supplemental Claim to which he was joined by reason of the Consolidation Order.

I do not find that Mr. Coyne was a direct beneficiary of the services agreement such that he is estopped to deny arbitrability; nor was he a third-party beneficiary of the agreement. His actions and his role with NWS, which ceased in December 2012 (when NWS was still a registered Wyoming corporation) did not make him a "party" by reason of assignment or successor liability. Nor is he bound to arbitrate under an agency theory.

SO ORDERED: March 5, 2014

_____

Robert E. Bartkus, arbitrator

27

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Audrey B. Collins _____ and to
Magistrate Judge _____ Michael R. Wilner _____ .

The case number on all documents filed with the Court should read as follows:

## CV 14-3034-ABC(MRWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of
California, the assigned Magistrate Judge has been designated to hear discovery-related
motions. All discovery-related motions should be noticed on the calendar of the Magistrate
Judge.

Clerk, U. S. District Court

_____ April 21, 2014 _____
Date

By  Rhonda Marshall _____
Deputy Clerk

## ATTENTION

*A copy of this Notice must be served on all parties served with the Summons and Complaint (or, in cases
removed from state court, on all parties served with the Notice of Removal) by the party who filed the
Complaint (or Notice of Removal).*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☒ )

Robert Coyne

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Asta Funding, Inc

**(b)** County of Residence of First Listed Plaintiff   LOS ANGELES
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   District of NJ
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

1016 17th street
Hermosa Beach Ca 90254
310 876 6140   Roco1x @ Yahoo.co

Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Complaint and Petition to Vacate Arbitration Award

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☒ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number:

CV-71 (11/13)

**CIVIL COVER SHEET**   Page 1 of 3

CV 14-3034

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| [ ] Yes  [X] No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

**Question B:  Is the United States, or one of its agencies or employees, a party to this action?**

[ ] Yes  [X] No

If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX.

| If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| **A PLAINTIFF?**<br>Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?**<br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| [ ] Los Angeles | [ ] Los Angeles | Western |
| [ ] Ventura, Santa Barbara, or San Luis Obispo | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| [ ] Orange | [ ] Orange | Southern |
| [ ] Riverside or San Bernardino | [ ] Riverside or San Bernardino | Eastern |
| [ ] Other | [ ] Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of defendants reside: | [ ] | [ ] | [ ] | [ ] | [ ] | [X] |
| Indicate the location in which a majority of claims arose: | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |

**C.1.  Is either of the following true?  If so, check the one that applies:**

[ ] 2 or more answers in Column C

[ ] only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. →

**C.2.  Is either of the following true?  If so, check the one that applies:**

[ ] 2 or more answers in Column D

[ ] only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ↓

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: → | LOS ANGELES COUNTY |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in **this court** that are related to the present case?   ☐ NO   ☒ YES

If yes, list case number(s): _CV 13-9372 ABC (CW x)_

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, **and** one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):**   _[signature]_   DATE: _4/20/2014_

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |